UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JAMES COMPTON | * | NO: 17-2258 |
| | * | |
| VERSUS | * | SECTION: M |
| | * | JUDGE BARRY W. ASHE |
| MONCLA COMPANIES, LLC | * | MAGISTRATE: 4 |
| | * | JUDGE KAREN WELLS ROBY |

**************************************************************************

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION IN LIMINE TO EXCLUDE PROPOSED EXPERT TESTIMONY OF DAVID PAULUS**

MAY IT PLEASE THE COURT:

Plaintiff, James Compton, respectfully requests that the Motion in Limine to Exclude the Proposed Expert Testimony of David Paulus (R. Doc. 47) filed by Defendant, Moncla Marine Operations, L.L.C. be denied. For the reasons set forth herein, Dr. Paulus can provide relevant and reliable opinions regarding the forces which hit Mr. Compton on the head on the Moncla 103 on February 29, 2016.

## FACTUAL BACKGROUND

This is a case involving very severe injuries caused by a falling object from a drilling rig mast in February 2016. On February 29, 2016, Mr. Compton was working as a floorhand on Moncla Rig 103. On the day of the injury, the power swivel was rigged up to make connections with the downhole equipment, and being moved by the cat line. As the driller, Dwayne Edmond, was in the drill shack maneuvering the cat line, he heard a whistling noise and the next thing anyone knew, Mr. Compton was struck in the head by a falling object.[1] Mr. Compton had been standing near the power swivel and was wearing a hard hat at the time this happened.[2] However,

---

[1] Deposition of Dwayne Edmond, attached as Exhibit 1, at p. 51.
[2] Deposition of Dennis Fontenot, attached as Exhibit 2, at p. 21.

the item (later identified as the counterweight on the cat line) fell at such a force that it hit Mr. Compton in the head, indented the hard hat, and knocked him down.[3] Under the hard hat that Mr. Compton was wearing was a significant cut, and the workers noted that he was bleeding from his head shortly after the accident.[4] Mr. Compton does not recall exactly what happened in the minutes that followed, only that he was ultimately taken into shore for medical treatment.[5] A photograph taken shortly after the incident shows the cut sustained by Mr. Compton on his head, all while wearing a hard hat:



The crew on Rig 103 reportedly determined itself that the shackle attaching the counterweight to the cat line had failed, and that the cotter pin securing the bolt in place in the shackle had backed out.[6] However, the crew made no effort to preserve any of these items, or take any photographs of the items which broke or needed to be repaired. They simply put the

[3] Edmond Dep. at pp. 69-70; Deposition of James Compton, attached as Exhibit 3, at pp. 239-240.
[4] Edmond Dep. at pp. 66, 69-70.
[5] Compton Dep. at pp. 241-42.
[6] Edmond Dep. at p. 74.

counterweight and cat line assembly back together on the following shift, and continued with the work on the rig.[7]

After the accident, Moncla reportedly preserved the item which hit Mr. Compton, as well as the hard hat which he was wearing at the time. Both of these items were presented for inspection on December 4, 2018. Given the visible physical injury sustained by Mr. Compton on the Moncla 103, Plaintiff retained an expert to examine the hard hat, the item which reportedly hit Mr. Compton, and determine what kind of forces could have been in play that could have caused the hard hat to be impacted in such a way that gashed open Mr. Compton's head underneath it. Dr. David Paulus was retained for that, and inspected the items presented by Moncla. At the time of the inspection, there were questions raised by counsel for both parties about whether the metal item preserved by Moncla was part of what hit Mr. Compton in the head, but in an abundance of caution, Dr. Paulus inspected that piece as well.

After the inspection, Dr. Paulus conducted several experiments on hard hats of the same make and model of that worn by Mr. Compton, to determine what kind of force could hit the hard hat in such a manner that would indent the hard hat, but allow the plastic to then pop out into its normal shape. This assumption was based on the fact that, at the time of the inspection, Mr. Compton's hard hat remained in its normal shape, with some markings on it where it had reportedly been hit by the falling object, combined with the undisputed fact that Mr. Compton had a large gash in his head where his hard hat had been after he was hit.[8]

Overall, the task required a number of assumptions, as no one from Moncla took photographs of the items that hit Mr. Compton at the time the incident happened, none of the parts from the cat line which fell and hit Mr. Compton were ever actually preserved, and there has been

---

[7] Deposition of Jimmie Lopez, attached as Exhibit 4, at pp. 33-34.
[8] Paulus Report, attached as Exhibit 5, at p. 6.

no clear consensus from any witness on the distance which the item fell before hitting Mr. Compton. There is also no consensus on the weight of the item which hit Mr. Compton.[9]

Based on these unknowns, Dr. Paulus completed a number of experiments by dropping various weights onto exemplar hard hats to determine the damage sustained in each of those variables. As he describes in his report, "[i]n order to understand how a falling mass may indent a hardhat as well as the magnitude of the indentation that would result from a weight falling on a hard hat, Dr. Paulus performed some preliminary exploratory testing to illuminate the effects of a weight falling on a hard hat."[10] Dr. Paulus then detailed, at length, his various tests performed that he relied upon to arrive at his ultimate opinions about the minimum force of impact on Mr. Compton's head.

His opinions are:

> **Engineering Opinions**
>
> Based on my education, training, and experience as well as the materials I have reviewed in this matter and the investigations I have conducted and calculations performed, I conclude the following to a reasonable degree of engineering certainty:
>
> 1. Based on the testing I performed, the hard hats were able to be significantly indented from a falling weight without cracking, and such indentations may "pop out" after impact with negligible evidence from the indentation. Thus, the Moncla hard hat presented as evidence may have also undergone significant indentation during impact.
> 2. Based on testimony by Mr. Compton and a report and conversation with Professional Engineer Gregg Perkin, the 2.5 lb crudely fabricated steel connector presented as evidence may have only been part of the mass that fell on Mr. Compton.
> 3. Based on engineering calculations, a 4 lb weight falling 20 ft onto a person's head while wearing hard hat would more likely than not have sufficient energy to cause a head acceleration of approximately 95 g's.

These opinions are based on his many years of experience as a mechanical engineer and expert as in the fields of human factors and engineering.

[9] Edmond Dep. at p.65.
[10] Ex. 5, p. 6.

## LAW AND ARGUMENT

### A. The Applicable Standards Regarding Expert Testimony.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

Trial courts have wide latitude in determining whether an expert meets the requirements of Federal Rule of Evidence 702 and that discretion "will not be disturbed on appeal unless it is manifestly erroneous."[11] The deferential abuse-of-discretion standard applies to the qualifications and reliability of an expert.[12]

The U.S. Supreme Court has instructed trial courts to act as "gate-keepers" to ensure that proffered expert testimony is both relevant and reliable.[13] In order to admit expert testimony, courts must determine "whether the expert is proposing to testify to: (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."[14] Both prongs must be met before the proffered testimony may be admitted.[15]

The first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology.[16] In determining the reliability of an expert, the court must focus solely on the

---

[11] *Roman v. Western Mfg., Inc.*, 691 F.3d 686 (5th Cir. 2012) (*citing United States v. Valencia,* 600 F.3d 389, 423 (5th Cir. 2010)).

[12] *Whitehouse Hotel Ltd. P'ship. v. Comm'r.,* 615 F.3d 321, 330 (5th Cir. 2010).

[13] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[14] *Id.*

[15] *Id.*

[16] *Id.*

principles and methodology and not the conclusions they generate.[17] Several factors should be considered when determining the soundness of an expert's methodology, including: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique used has been generally accepted; (3) the known or potential rate of error of the technique or theory when applied; and (4) whether the theory or technique used has been generally accepted.[18]

These factors are non-exclusive; rather they are a flexible test in ascertaining the validity and reliability of the methodology the expert employed.[19] The applicability of each factor depends on the particular facts of a case.[20] Courts have also found other factors important in determining whether expert testimony is sufficiently reliable such as if the expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying."[21] Indeed, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[22] "No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."[23]

The second prong of *Daubert*, whether the proposed testimony assist the trier of fact in understanding a fact in issue, goes primarily to the issue of relevancy.[24] The *Daubert* Court described this examination as a question of whether the expert testimony proffered is sufficiently

---

[17] *Id.*
[18] *Morris v. Liberty Mut. Ins. Co.*, 2011 WL 317741 (E.D. La. 2011).
[19] *Id.* (*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)).
[20] *Id.* (*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)).
[21] FRE 702 Advisory Committee Notes, 2000 Amendments.
[22] *Id.*
[23] *Kumho Tire Co.*, 119 S.Ct. at 1178 (1999).
[24] *Morris,* at *2 (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)).

tied to the facts of the case such that it will aid the fact finder in resolving a factual dispute.[25] In relation to an argument that an expert should be excluded because he will not assist the trier of the fact, the Advisory Committee Notes to F.R.E. 702 state that "[w]hether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier." Moreover, the Fifth Circuit has made it clear that expert testimony should only be excluded if the court finds that "the jury could adeptly assess [the] situation using only their common experience and knowledge."[26] "There is no more a certain test for determining when experts may be used than the commonsense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."[27]

The intent behind F.R.E. 702 and *Daubert* is to make it easier to secure expert testimony. It is not supposed to be used as a sword but as a shield. As the Advisory Committee Notes to F.R.E. 702 further point out:

> [a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a "sea change over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.[28]

Courts are to balance the benefit the jury will get by hearing expert testimony against the harm or confusion that might result if the testimony is not reliable. "When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time."[29] It is only those

---

[25] *Id.*
[26] *Peters v. Five Star Marine Serv.,* 898 F.2d 448 (5th Cir. 1990).
[27] *Paster v. Ingram Barge*, 2015 WL 3680700 (E.D.La. 2015) (*citing* Fed.R.Evid. 702, Advisory Committee Note.)
[28] FRE 702 Advisory Committee Notes, 2000 Amendments, (*citing* *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996)).
[29] FRE 702 Advisory Committee Notes (*citing* 7 Wigmore § 1918).

opinions that are "so fundamentally unsupported that it can offer no assistance to the jury" that must be excluded.[30]

The court's role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system.[31] As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[32] Moreover, the Fifth Circuit has held that, in determining the admissibility of expert testimony, a district court must defer to "the jury's role as the proper arbiter of disputes between conflicting opinions." "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[33]

**B. Dr. Paulus's Opinions are Reliable.**

Moncla makes much of the fact that the object which it presented for inspection in December 2018 as part of the apparatus which hit Mr. Compton was not, in fact, related in any way to the accident. What is missing from Moncla's motion is that what actually hit Mr. Compton was not preserved by Moncla itself, and there has been no explanation as to why the object shown at the December 2018 inspection was presented as something which could have been part of the apparatus which hit Mr. Compton on the Moncla 103. The fact that the fabricated metal was not part of what hit Mr. Compton was not confirmed until well after Dr. Paulus had conducted his experiments on weights and forces required to temporarily indent a hard hat. Moncla made no effort to preserve what actually hit Mr. Compton, nor provide any weights of the object which hit

---

30 *Edmonds v. Illinois Cent. Gulf R. Co.*, 910 F.2d 1284 (5th Cir. 1990).
31 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).
32 *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) citing *Rock v. Arkansas,* 483 U.S. 44, 61 (1987).
33 *United States v. 14.38 Acres of Land, More or Less Sit. in Leflore County, Miss.,* 80 F.3d 1074, 1077 (5th Cir. 1996) (*citing Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 422 (5th Cir.1987)).

Mr. Compton. Thus, necessarily, any of Dr. Paulus's calculations and experiments deal with a number of assumptions.

Moncla also attempts to argue that perhaps Mr. Compton's hard hat did not indent during the event, and that assumption by Dr. Paulus is erroneous. It is clear that the basis of Dr. Paulus's assumption regarding the indent is the photographic evidence of the large cut sustained by Mr. Compton from the object hitting him while wearing a hard hat, coupled with the fact that the hard hat produced by Mr. Compton appeared to have been struck by something but was in its relatively normal shape after the incident. Mr. Compton himself did recall seeing an indent in his hard hat after he was struck.[34] Accordingly, Dr. Paulus conducted a number of experiments to determine what force could be necessary to hit a hard hat like Mr. Compton's, indent the hard hat to an extent that would allow an inner portion of the hard hat to strike the head underneath, and then pop back out to the usual shape.[35]

As he explained in his deposition taken earlier this month, Dr. Paulus was concerned about calculating force, which can be done by varying weights and heights from which those weights are dropped.[36] While Mr. Edmond estimated that the item fell between 15 and 20 feet before hitting Mr. Compton, and Mr. Compton estimates that the item at issue weighed between 10 and 20 pounds, Mr. Edmond did not know how much the item weighed, and Moncla made no effort to preserve the item which hit Mr. Compton. Thus, a number of different variables needed to be used to calculate the ultimate force at issue.

Moncla also attempts to undermine Dr. Paulus's opinions by arguing that he should have conducted this destructive testing on Mr. Compton's hard hat itself, or hard hats the same age as

[34] Compton Dep. at pp. 239-240.
[35] Ex. 5.
[36] Deposition of Dr. David Paulus, attached as Exhibit 6, at p. 21, 52.

Mr. Compton's at the time of the injury. First, destructive testing would not allow for the jury to see the hard hat which Mr. Compton was wearing, along with its current condition and likely blood on the inside of the hat. Second, if Moncla questions the wear and tear a hard hat has sustained over the years, and whether a falling object could create more or less damage on an older hard hat, Moncla was free to retain its own expert to conduct similar investigations. It has presented no evidence that such factors would play any part at all in these force calculations. It should not be allowed to, at this point, poke holes in Dr. Paulus's detailed and heavily documented experiments and claim Dr. Paulus's opinions are unreliable simply through unsupported arguments made by counsel. Such arguments are more appropriate for trial, and cross-examination of Dr. Paulus under oath.

**C. Dr. Paulus's Opinions are Relevant.**

Again, Moncla claims Dr. Paulus's opinions are irrelevant because rendered opinions on variable factors. However, those factors are variable precisely because of Moncla's failure to properly preserve many of the objects in question. Destructive testing of Mr. Compton's hard hat has not been contemplated in this case, nor would Mr. Compton agree to such testing, as he wants to be able to show the hat to the jury at trial. The weight of the object which hit Mr. Compton is unknown, because Moncla itself failed to preserve it. It should not be allowed to now complain about exemplar testing which had to be done because it failed to properly preserve the items involved in a very serious workplace accident.

Dr. Paulus has a Ph.D in mechanical engineering, and many years of experience in human factors testing. His testimony regarding the forces which could have caused the hard hat to buckle and create the visible head injury suffered by Mr. Compton will help the jury understand the severity of the impact which Mr. Compton suffered. As the object which hit Mr. Compton was not preserved, and there is no consensus on the distance the object fell before hitting Mr. Compton, the jury will benefit

from hearing about the probable weights of the object which hit Mr. Compton in the head, and the forces his head sustained when he was hit. Dr. Paulus will not be testifying about whether Mr. Compton did or did not suffer from any head injury or cognitive injury, other than the visible physical injury documented in post-accident photographs. Plaintiff will present the testimony of several physicians who have opined that he does indeed suffer from a brain injury and cognitive deficiencies as a result of this incident at trial. Dr. Paulus's testimony will complement that by allowing the jury to understand the forces Mr. Compton's head likely underwent when he was hit by a falling object on the Moncla 103 on February 29, 2016. This cannot be accomplished by any other lay testimony.

### D. Dr. Paulus Will Not Testify About Medical Causation Opinions.

Finally, Dr. Paulus is not a medical expert, and he will not be asked to give any opinions on the causation of Plaintiff's cognitive deficiencies and head injury. He has not reviewed any medical records, and Plaintiff concurs that Dr. Paulus is not being presented as a medical expert in this case. Although asked several questions about the "head injury" sustained by Mr. Compton in his deposition, Dr. Paulus clarified that the "head injury" about which he spoke and opined was the physically visible one contained within his report.[37] There is no suggestion or evidence that Mr. Compton sustained the physical injury to his head at any time prior to being struck on the head while on the Moncla 103. His own supervisor testified that he saw blood dripping down Mr. Compton's face immediately after this incident, from the cut on his head. To the extent there are opinions on the causation of this specific aspect of Mr. Compton's head injury, Dr. Paulus does need to discuss it, as it is an important factor in his force calculations for the hard hat.

---

[37] Paulus Dep. at pp. 50-51.

## CONCLUSION

For all of the reasons set forth herein, Plaintiff respectfully requests that this Court deny the motion filed by Moncla to exclude the testimony of Dr. Paulus from trial. Dr. Paulus's opinions clearly meet the requirements of Federal Rule of Civil Procedure 702 and the *Daubert* standards. He is qualified to render opinions in this case and his testimony will certainly assist the jury. Any issues defendant may have with Dr. Paulus's opinions and testimony are more properly addressed via cross examination during trial. For all such reasons defendant's Motion to *in Limine* to Exclude David Paulus should be denied.

Respectfully Submitted,

*s/Megan C. Misko*

TIMOTHY J. YOUNG (22677)
TAMMY D. HARRIS (29896)
MEGAN C. MISKO (29803)
JOSEPH B. MARINO, III (29966)
THE YOUNG FIRM
400 Poydras Street, Suite 2090
New Orleans, Louisiana 70130
Telephone: (504) 680-4100
Facsimile: (504) 680-4101